**Mark S. ROSE and Fredric G. Rose, Plaintiffs,**

v.

**AMSOUTH BANK OF FLORIDA, Defendant.**

**No. 01–CV–5696(ADS)(WDW).**

United States District Court, E.D. New York.

Dec. 13, 2003.

no as "our Field Inspector." (Hempstead Town Board Hearing at 6).

The Law Office of William R. Garbarino, Esq. by William R. Garbarino, Esq. and Donald R. Hamill, Esq., Of Counsel, Sayville, NY, for Plaintiffs.

Silverman Perlstein & Acampora, LLP by Anthony C. Acampora, Esq., Robert J. Ansell, Esq., and Jay Hellman, Esq., Of Counsel, Jericho, NY, for Defendant AmSouth Bank.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case presents the interesting interplay of two assignments of the proceeds of a life insurance policy, eleven years apart, in which the two assignees have no knowledge of one another. To make this matter further intriguing, the life insurance company may have known of only one of the assignments, prior to the death of the beneficiary-assignor.

The plaintiffs Mark S. Rose and Fredric G. Rose (collectively, the "plaintiffs" or the "Roses") allege that the defendant AmSouth Bank of Florida (the "defendant" or "AmSouth") is liable to them for a portion of the proceeds of a life insurance policy on the life of one Michael Montana ("Montana").

## I. BACKGROUND

In this lawsuit as originally filed, the plaintiffs alleged that the defendants The Fidelity Mutual Life Insurance Company ("Fidelity") and AmSouth Bank of Florida failed to pay them certain proceeds under a life insurance policy on the life of Montana. On June 25, 2001, the plaintiffs filed a complaint against Fidelity and AmSouth in the Supreme Court of the State of New York, Suffolk County. The complaint alleges that Fidelity issued a life insurance policy on the life of Michael Montana. This life insurance policy was numbered 1 222 645 (the "645 policy" or the "Policy"). Sometime thereafter, on March 29, 1986, the plaintiffs entered into a "Split Dollar Agreement" with Montana, by the terms of which the plaintiffs would pay certain premiums on the 645 policy. The plaintiffs allege that as part of that agreement,

Montana assigned the Policy to the plaintiffs to the extent needed to repay the plaintiffs for the sum paid for premiums on the Policy, which was alleged in the complaint, albeit erroneously, to be the total sum of $351,574. During the trial, it was revealed that the total amount of premiums paid by the plaintiffs was actually the sum of $218,633.

Eleven years after the assignment to the plaintiffs, the defendant AmSouth obtained two assignments from Montana on the same 645 policy. These assignments were dated January 29, 1997 and January 31, 1997.

On March 21, 1999, Michael Montana died. Thereafter, the plaintiffs allege that they demanded payment from Fidelity in the sum of $351,574 from the proceeds of the 645 Policy. However, AmSouth also demanded that Fidelity pay it the proceeds of the Policy pursuant to the assignments Montana made to AmSouth. Based on the AmSouth assignment, Fidelity paid AmSouth the entire net proceeds of the Policy. This was the sum of $1,650,562.40, which comprised the policy amount of two million dollars less loans on the policy. The plaintiffs then demanded that AmSouth pay them the said sum of $351,574. AmSouth declined to do so. On June 25, 2001, the plaintiffs filed a complaint against the defendants in the Supreme Court of the State of New York, Suffolk County. The complaint seeks to recover the sum of $351,574 against AmSouth based on a single cause of action for conversion. Fidelity had filed a petition in bankruptcy and, on November 6, 1992 was placed into rehabilitation under the jurisdiction of the Commonwealth Court of Pennsylvania (the "Commonwealth Court"). On February 11, 1998, the Commonwealth Court established a process for the adjudication of claims against Fidelity.

On August 24, 2001, the defendants removed this action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441(a). AmSouth then answered the complaint and Fidelity moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) on the ground that any claim against it must be adjudicated in its ongoing rehabilitation proceedings in Pennsylvania. The plaintiffs also moved to sever the action pursuant to Rule 42(b) so as to proceed separately against AmSouth.

On July 2, 2002, the Court granted Fidelity's motion holding that the plaintiffs must pursue their claims against Fidelity in the ongoing rehabilitation proceedings in Pennsylvania. *Rose v. Fid. Mut. Life Ins. Co.*, 207 F.Supp.2d 50, 53–54 (E.D.N.Y.2002). The plaintiffs then waived a trial by jury and the Court placed the case on its non-jury reserve calendar. Thereafter, both the plaintiffs and AmSouth moved for summary judgment. In a decision dated January 25, 2003, the Court denied both motions on the ground that there were genuine issues of material fact.

## II. THE TRIAL—FINDINGS OF FACT

This memorandum and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124–125 (2d Cir.2003); *Colonial Exchange Ltd. Partnership v. Cont'l Cas. Co.*, 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

In the plaintiffs' case, Victoria Keisker, a Vice President of Customer Service of Fidelity, was called to testify regarding the Fidelity records. On July 15, 1986, Fidelity issued life insurance policy number 1222645. The owner and beneficiary of the policy was Robert Montana, trustee.

Keisker produced a duplicate copy of the policy. *See* Exhibit 4 of the Plaintiffs' Trial Exhibits ("Plfs.Ex. ___"). In addition, there was introduced a Fidelity memorandum, dated February 18, 1988, to Steven Dubin, a Fidelity agent, confirming that the company records were marked to indicate the name of the owner and beneficiary of the policy to be "Robert Montana, trustee under the irrevocable agreement dated March 19, 1986." Plfs. Ex. 5. Also admitted was a certified copy of the death certificate of Michael Montana, who died on March 21, 1999. Plfs. Ex. 3.

In a letter from Fidelity to plaintiffs' Attorney William E. Garbarino, dated April 5, 1999, shortly after Montana's death, it was stated, in part:

RE: Policies 1215860 and 1222645

Insured: Michael Montana

Dear Mr. Garbarino:

This is in reply to your letter dated April 28, 1999 (sic).

Enclosed is a copy of the assignment and the Form 751 # 4 for policy 1222645, this was overlooked in my letter of March 25, 1999, the Form 751 # 4 must be completed and signed by an officer of the bank.

These policies were subject to a split dollar agreement, but it is no longer operative see enclosed copy of a letter dated October 19, 1993.

I am enclosing Lost Policy Statements you requested and also a copy of my letter showing the loans on each policy. Plfs. Ex. 9.

Enclosed in the April 5, 1999 Fidelity letter is a memorandum from Steven H. Dubin, an insurance broker, to Fidelity dated October 19, 1993, referring to the four Michael Montana life insurance policies, including policy 645. The memorandum states, in part:

Previously they had been paid under an Agreement of Split Dollar which is no longer operative since the company of

which he was President has been sold by its owners (our clients the Rose family).

Also, Keisker testified that the entire net proceeds of policy 645 in the sum of $1,650,562.40 were paid to AmSouth. Plfs. Ex. 14.

In addition, admitted through Keisker was a life insurance questionnaire. Plfs. Ex. 13. This document is used by a bank when it wants to make a loan based on an assignment of a life insurance policy as collateral. Prior to making the loan, the bank would send the questionnaire to the life insurance company requesting information regarding the policy. In this case, on January 31, 1997, AmSouth made a request to Fidelity inquiring as to any other existing assignments as to policy 645. Fidelity replied to the request by AmSouth. Question 7 of that request stated:

7. Any existing assignments on record? ☐YES ☑NO

Also introduced through Keisker was a letter from Fidelity to Richard Haselton, Vice President of AmSouth, dated February 6, 1997, *see* Dft. Ex. A, indicating that the AmSouth collateral assignment from Montana had been recorded. The letter stated:

February 6, 1997

| Policy Number | Insured's Name |
|---|---|
| 1222645 | Michael Montana |

Dear Mr. Haselton:

Thank you for sending us the *Assignment of Policy as Collateral Security.* We have recorded the collateral assignment form as requested. Enclosed is a certified copy for the assignee's records.

This assignment has been recorded subject to a policy loan of $226,476.04. This loan is a first lien against the policy.

If a collateral assignment is in effect at the insured's death, any amount certified as owed to the assignee will be paid to

the assignee. Any proceeds remaining will be paid to the beneficiary.

This insurance has the automatic premium loan provision.

The policy loan referred to in this letter was, apparently, other loans against the policy and does not refer to the split dollar agreement with the plaintiffs. The Am-South/Montana assignment was recorded with Fidelity as of February 6, 1997.

Steven H. Dubin also testified in the plaintiffs' case. He is a founding principal of Williams & Dubin, an insurance brokerage and investment consulting firm located in Quincy, Massachusetts. He was the appointed agent for Fidelity from 1975 through the mid–90s when it terminated all field agents. Dubin is familiar with the plaintiffs and Michael Montana.

In 1984 and 1985, he helped establish a split dollar plan between the Roses and a trust for the benefit of Montana's family. He also provided and brokered the insurance that funded their arrangement. At that time, the Roses and Montana were located in their offices at Reliance Fuel Company in Patchogue, New York. The Roses, Montana and some other family trust interests were the owners of Reliance Fuel Company, a home fuel oil delivery company. Dubin "put together a memorandum describing how a split dollar insurance program would work, who it might be by and between, and presented it to Mickey Montana, Robert Wertley, and the Roses." Tr. at 63.* His goal was to sell Fidelity insurance in connection with this arrangement.

Dubin discussed his October 19, 1993 memorandum to Fidelity, *see* Plfs. Ex. 9A, referred to above in which he indicates that a split dollar agreement was "no longer operative since Reliance Fuel had been sold by the Rose Family." Dubin was asked to explain what this meant:

Q Mr. Dubin, you just read a sentence that said previously they had been paid under an agreement of split dollar which is no longer operative since the company of which he was president had been sold by its owners, our clients, the Rose family.

Could you please tell me what you meant by that?

A Yes.

I was under the belief that the split dollar agreement, which had existed, was resolved as part of the sale of the business and Mickey's leaving the company and as a matter of fact going to Florida.

Tr. at 76.

Also introduced through the testimony of Dubin was a document called "Assignments of Life Insurance Policy as Collateral," dated March 19, 1986. Plfs. Ex. 18. In this assignment, Robert Montana as attorney for "Montana Trust Owner" assigned to the plaintiffs as collateral security three life insurance policies, including policy number 1–215–859, which was converted in 1996 to the subject policy 645.

The "Split Dollar Agreement" was also introduced through the testimony of Dubin. Plfs. Ex. 19. In answer to questions by the Court, Dubin defined this type of agreement:

It's a form of insurance financing where one party will advance premiums for the benefit of a second party who typically owns an insurance policy, in consideration of the return of those premiums at either the termination of the agreement, or the death of the insured.

Tr. at 119.

On December 4, 1987, Dubin wrote to Fidelity enclosing a copy of the Michael Montana trust agreement. Plfs. Ex. 8A.

---

* Tr. refers to Trial Transcript

The trust agreement itself, *see* Plfs. Ex. 8, was dated March 19, 1986 and established a trust with Michael Montana as the grantor and Robert Montana as the trustee. In the trust agreement, there was no reference to a split dollar agreement with the plaintiffs. The result of the trust agreement was that the owner of the 645 policy was Robert Montana as trustee.

The Montana insurance premium history was admitted. Plfs. Ex 16. It indicated that a total sum of $218,633 in premiums was paid on policy 645 between 1985 and 1991. No premium was paid after 1991. Dubin testified that the premiums on policy 645 were paid by Reliance Fuel Oil Co. Notwithstanding other assertions by the plaintiffs and their counsel, the Court finds that the amount of premiums paid by the plaintiffs on policy 645 were in the total sum of $218,633.

Dubin testified that he notified Fidelity about the plaintiffs' "Assignment of Life Insurance Policy as Collateral" in 1986. However, he had no documents that evidenced such notification:

Q You testified on your direct examination that you sent a copy of the assignment to Fidelity. Is that correct?
A Yes, I did.
Q Do you have that assignment in front of you?
A Yes, I do. I believe it has been marked as an exhibit. I have it right here. I believe it has been marked as Plaintiffs' Exhibit 18.
Q How do you know that you filed it?
A Because in the normal course of my business we always send in the assignments.
Q Did you prepare a letter to Fidelity stating that you were enclosing that assignment?
A In the normal course of business I would have prepared a transmittal letter.

Q Do you have a copy of that letter with you?
A No, sir, I do not.
Q Did you search your records?
A Yes, I did.
Q You couldn't find a letter?
A No, sir.
Q Other than the records you have with you today, are there any other records?
A Not that I could find.

\* \* \* \* \* \*

Q Do you know whether you prepared that letter on a typewriter or on the computer system?
A I would possibly think my administrative assistant prepared it.
Q So you didn't actually prepare the letter?
A Probably not. It is unlikely.
Q Did you search your computer records to see if you had a copy of that letter?

\* \* \* \* \* \*

A Yes, I searched my computer records for everything on Michael Montana.
Q And you were unable to find the letter?
A That is correct, sir.
Q Did you ever get a response back from Fidelity that they had received your letter, and that they received the assignment?
A I don't think I did.
Q Did you search your records with you today?
A I searched my records for all the records that I have relating to this Michael Montana situation.
Q And you were unable to find it?
A That is correct, sir.
Q Do you recall receiving a response from Fidelity?

A No, I don't.

Q Does Fidelity normally send a response to you?

A Yes, they normally did.

Q Let me finish my question, please.

A I'm sorry.

Q Does Fidelity normally give you a response when you send an assignment to them?

A Yes, they do.

Q Did you ever follow up with Fidelity?

A No, I didn't.

Tr. at 140–142.

Dubin never sent a copy of the Split Dollar Agreement to Fidelity.

Robert A. Wertley was another witness in the plaintiffs' case. He is a certified public accountant and is the Rose family personal accountant. He is familiar with the 645 policy on the life of Michael Montana. Wertley was also an officer and director of the Reliance Fuel Oil Co. As to the Split Dollar Agreement, Wertley testified that the plaintiffs made the premium payments in the following manner: The two plaintiffs paid Reliance Fuel Oil on Clare Rose checks and then the premium payments were made with Reliance Fuel Oil checks. So that in reality, according to Wertley, the premiums were paid by the plaintiffs. According to Wertley, the total premiums paid in this manner was the sum of $218,330. No loans were paid on the policy but interest payments were made in the sum of $9,523. So that the total amount paid by the plaintiffs was the sum of $227,853, including premiums and interest. Wertley does not recall seeing the Montana "Assignment of Life Insurance Policy as Collateral" prior to this lawsuit. Wertley further stated that the assets of Reliance Fuel Oil Co. were sold in September 1991.

Attorney William R. Garbarino also testified for the plaintiffs. He stated that he sent two letters to Fidelity with regard to the Split Dollar Agreement. The first letter dated May 13, 1999, *see* Plfs. Ex. 10, sent after Michael Montana's death on March 28, 1999, stated, in part:

May 13, 1999

Re: Policies 1215860 & 1222645

Dear Ms. Doyle:

Thank you for your letter which I received on May 10, 1999, in which you enclosed a copy of assignment for policy number 1 222 645.

As you pointed out in your letter, the above mentioned policies were subject to a split dollar agreement. There are moneys owed pursuant to the split dollar agreement. I have contacted Steven Dubin, the agent, and requested that he provide me with the amount owed on said split dollar agreement.

In view of the foregoing, please do not pay out on either policy until I have submitted these figures to you.

Further, if there is a form which must be filed pursuant to the split dollar agreement, please forward same to me.

Garbarino then sent a letter to Fidelity, dated July 20, 1999, *see* Plfs. Ex.11, enclosing the Split Dollar Agreement and other documents, as follows:

Re: Policies 1215860 & 1222645

Insured Michael Montana

Dear Ms. Doyle:

In connection with the Split Dollar Agreement covering the above-referenced policies, I enclose herewith the following documents for your review:

(1) Copy of Split Dollar Agreement dated March 19, 1986

(2) Copy of Assignment of Life Insurance Policy as Collateral

These letters were sent only to Fidelity. The first notice of the plaintiffs' claim to the defendant AmSouth was a letter by

Garbarino to AmSouth on June 7, 2001, Plfs. Ex. 21, three years after Montana's death. This letter reads as follows:

June 7, 2001

AmSouth Bank of Florida

P.O. Box 179

Clearwater, Florida 34617–1079

Re: Policy number 1 222 645 issued by The Fidelity Mutual Life Insurance Company

Insured: Michael Montana

Dear Sirs:

I am the attorney for Mark S. Rose and Frederick G. Rose.

As part of a split dollar agreement the aforesaid policy of insurance on the life of Michael Montana was assigned to my clients.

The proceeds of this policy became the property of my clients upon the death of Michael Montana.

The Fidelity Mutual Life Insurance Company wrongly paid the proceeds of this policy to AmSouth Bank of Florida in the amount of $351,574.00.

Demand is hereby made for the return of my clients property; to wit: the sum of $351,574.00, together with interest from March 21, 1999, the date of Mr. Montana's death.

It appears from a Fidelity check disbursement form, *see* Plfs. Ex. 14, that Fidelity paid the net proceeds of the life insurance policy 1222645 on the life of Michael Montana in the sum of $1,650,562.40 to defendant AmSouth, on or about October 27, 1999.

In evidence is a letter from Fidelity to Garbarino, dated July 31, 2000, *see* Plfs. Ex. 6, explaining that the proceeds of the 645 policy were paid to AmSouth.

July 31, 2000

Re: Policy No. 1222645 Insured: Michael Montana

Dear Mr. Garbarino:

This is in response to your June 29, 2000 letter concerning the death claim paid on Policy Number 1222645.

On the date of the Insured's death, the only assignee of record was AmSouth Bank. The assignment to AmSouth Bank was executed by Robert Montana, Trustee of the Michael Montana Irrevocable Life Insurance Trust and was submitted to FML and recorded on February 6, 1997. Since the amount of the note to AmSouth Bank exceeded the death proceeds of the policy, Fidelity Mutual paid the entire death proceeds to the assignee of record, AmSouth Bank.

At the conclusion of the plaintiffs' case, the Court granted a motion by the plaintiffs to amend the complaint to add, in addition to conversion, causes of action for monies had and received, constructive trust and unjust enrichment.

In the defendants' case, one witness was produced, P. Robert Jackson, Senior Vice President of AmSouth, manager of the collection of commercial loans. He was familiar with Michael Montana since approximately 1997. It seems that AmSouth "lent approximately $10 million to the various (Montana) entities, including Michael Montana directly." Tr. at 232. Jackson explained the involvement of AmSouth, the Montana entities, and Fidelity, as follows:

Q Can you tell us what business transaction AmSouth had with the Montana businesses?

A What type of transaction?

Q Yes.

A We had lent approximately $10 million to the various entities, including Michael Montana directly.

Q Now, as part of the loan transactions, did there come a time when AmSouth and Robert Montana, as trustee for a Michael Montana trust, executed a

collateral assignment on a life insurance policy?

A Yes.

Q Was that with respect to policy number 1222645?

A Yes.

Tr. at 232.

On January 31, 1997, the Michael J. Montana 1985 Irrevocable Insurance Trustee as Assignor and AmSouth Bank of Florida as Assignee entered into a document called a Collateral Assignment of Life Insurance Policy. *See* Exhibit F of the Defendant's Trial Exhibits ("Dft.Ex.___"). In this assignment, the Montana trustee as assignor assigned to AmSouth as assignee, its interest in Fidelity life insurance policy number 1222645 which was in the face amount of two million dollars. On that same date, January 31, 1997, AmSouth sent Fidelity the Life Insurance Assignment Questionnaire. Plfs. Ex. 13. As stated above, Fidelity responded to the questionnaire that there were no existing assignments on record against policy 645.

Also introduced was a document entitled an "Assignment of Policy as Collateral Security" to AmSouth, dated January 29, 1997 and signed by Robert Montana, Trustee. *See* Dft. Ex. G. Jackson testified that AmSouth sent this assignment to Fidelity who acknowledged receipt by putting a stamp on the document noting it was received and recorded by one Janet Downey on February 6, 1997. After being so stamped, the assignment was returned to AmSouth. In this regard, Jackson stated that "this policy [645] required that an assignment be recorded with Fidelity and we were complying with that requirement in the life insurance policy." Tr. at 242.

When Jackson learned that Michael Montana died, as the loan collection officer he immediately engaged counsel and filed a claim "pursuant to our recorded assignment." In this regard, on October 20, 1999, Jackson sent a claim letter to Fidelity. After that, payment of the proceeds of the policy was received by AmSouth in the sum of $1,650,562.40. On cross-examination, Jackson conceded that AmSouth has no document that says that the 1986 Michael Montana irrevocable trust is obligated to the bank.

## III. DISCUSSION

The plaintiffs contend that, as the first assignees, they are the legal owners of the insurance proceeds to the extent of the premiums paid for the 645 policy. The basis for this contention is that "only two possibilities exist: either the defendant AmSouth did not have any valid assignment ... or, in the alternative, the defendant AmSouth had an assignment that was junior in time by some eleven years to the plaintiff's [sic] assignment, in which case the plaintiffs' first in time assignment takes priority." Plfs. Post Trial Mem. at 15. As set forth below, both of these arguments are without merit—although initially the plaintiffs had a valid assignment.

### A. The Plaintiffs' Claim of Priority

#### 1. The initial assignment

As a result of their assignment, the plaintiffs owned an equitable title to the life insurance proceeds in the amount of the premiums they paid because:

> [w]here a person, not being the owner of a policy of life insurance, nor bound to pay premiums, and having some claim or color of interest in it, voluntarily pays the premiums thereon, and thus keeps it alive for the benefit of a third party, he may thereby acquire an equitable interest in the proceeds of the policy as security for the repayment of his advances.

*Morgan, et al., v. Mut. Benefit Life Ins. Co., et al.,* 132 A.D. 455, 116 N.Y.S. 989, 990 (4th Dep't 1909).

The defendant contends that the assignment is invalid because the plaintiffs failed to record it with Fidelity pursuant to the terms of the policy. Def. Post Trial Mem. of Law at 10. The assignment clause in the 645 policy provides:

> [t]he owner may assign this policy. But we will not be bound by an assignment until we've recorded it. Nor will we be liable for any proceeds we've paid before recording it. We assume any assignment to be legal, but do not guarantee its effectiveness.

However, contrary to the defendant's contention, the plaintiffs' failure to record their assignment does not, by itself, render the assignment invalid. *See Belge v. Aetna Cas. & Sur. Co.,* 39 A.D.2d 295, 297, 334 N.Y.S.2d 185 (4th Dep't 1972) (citations omitted); *see also Sillman v. Twentieth Century–Fox Film Corp.,* 3 N.Y.2d 395, 402, 165 N.Y.S.2d 498, 144 N.E.2d 387 (1957) (The assignee of rights under a bilateral contract does not become bound to perform the duties under the contract unless he expressly assumes to do so.).

■ Furthermore, this clause is a personal covenant between Fidelity and Montana. *See Allhusen v. Caristo Const. Corp.,* 303 N.Y. 446, 450, 103 N.E.2d 891, 892 (1952); *see also Herman v. Connecticut Mut. Life Insurance Co.,* 218 Mass. 181, 185, 105 N.E. 450, 451 (1914). Therefore, AmSouth does not have the standing to argue that the assignment between Montana and the plaintiffs is invalid due to the lack of its recording as this covenant only creates rights on behalf of Fidelity against Montana. *Id.* Because this clause does not impair any rights between the two assignees and it does not affect the validity of Montana's assignment to the plaintiffs, the defendant's reliance on the recording clause contained in the 645 poli-

cy is misplaced. Accordingly, the assignment from Montana to the plaintiffs was valid, notwithstanding the fact that it was not recorded with Fidelity.

## 2. Estoppel as to the plaintiffs' assignment

■ It is settled law in New York that, *other things being equal,* the first assignee has a priority over the second assignee irrespective of whether the second first notifies the debtor. *Rochester Ropes, Inc. v. Scherl,* 121 F.2d 852 (2d Cir.1941) (emphasis added) ("As between successive assignees of the same chose in action priority in point of time establishes priority of right, under New York law, without regard to the date of the notification to the debtor.") (*citing Fortunato v. Patten,* 147 N.Y. 277, 283, 41 N.E. 572 (1895) ("[A]s between different assignees of a chose in action by express assignment from the same person, the one prior in point of time will be protected, although he has given no notice of such assignment to either the subsequent assignee or the debtor")); *see also State Bank of Mayville v. Jennings, et al.,* 78 Misc. 524, 526, 138 N.Y.S. 606 (1912) ("The general rule undoubtedly is that in equity, between conflicting equitable interests or liens, other things being equal, the one that is prior in time is superior in right.").

The rationale for the first in time, first in right rule is that "by the first assignment, the rights of the assignor pass to the assignee ... Notice of the assignment to the debtor adds nothing to the right to be transferred. A subsequent assignee takes nothing by his assignment because the assignor has nothing to give." *Superior Brassiere Co. v. Zimetbaum,* 214 A.D. 525, 527, 212 N.Y.S. 473 (1st Dep't 1925) (*quoting Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. 182, 197, 44 S.Ct. 266, 68 L.Ed. 628 (1924)).

■ However, as between different assignees of the same chose in action, the one prior in time is not always entitled to priority. The first assignee may be estopped from establishing priority because the equities of the claimants are not always equal. *See Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. 182, 198, 44 S.Ct. 266, 270, 68 L.Ed. 628 (1924) *see also State Bank of Mayville,* 78 Misc. 524, 526, 138 N.Y.S. 606.

■ Generally, "[i]f the second assignee elects to rely on the representations of the vendor as to his title, and is deceived, he cannot shift his loss to the first assignee, *unless some act or omission of the latter was proximate to the deception." Superior Brassiere Co. v. Zimetbaum,* 214 A.D. at 527, 212 N.Y.S. 473, (emphasis added) *(quoting Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. 182, 197–98, 44 S.Ct. 266, 68 L.Ed. 628). However, in citing *Salem Trust,* the First Department in *Superior Brassiere* omitted that part of the Supreme Court's decision which explained that a first assignee of a chose in action, because of its conduct, may be estopped from establishing priority:

> Facts and circumstances may create an equitable estoppel against the first assignee. *Herman v. Mutual Life Insurance Co.,* 218 Mass. 181, 105 N.E. 450, Ann. Cas.1916A, 822; *Rabinowitz v. People's National Bank,* 235 Mass. 102, 126 N.E. 289 ... It would be unconscionable to permit [the first assignee] to prevail over a later assignee whom he had misled or deceived in respect of the assignor's title at the time of purchase by the latter. But, assuming a duty on the first purchaser to protect a subsequent assignee against deception and fraud by the assignor, there is no ground for subordinating his claim, unless his failure was an element in or contributed to the deception. In the absence of inquiry by the subsequent purchaser, the failure of the first to give notice is immaterial.

*Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. at 198, 44 S.Ct. 266. Although the plaintiffs did not intentionally mislead or deceive AmSouth, the Court finds that they totally failed to protect their assignment in any manner. Indeed, their failure to record their assignment coupled with their eleven year delay in notifying Fidelity, enabled Montana to assign the same life insurance proceeds to AmSouth, an innocent party.

Similar to the case at bar, *Herman* involved the assignment of the proceeds of the same life insurance policy to two separate individuals, each without the knowledge of the other. *See Herman v. Connecticut Mut. Life Insurance Co.,* 218 Mass. 181, 185, 105 N.E. 450, 451 (1914). As in the instant case, the *Herman* plaintiff was the first assignee of the policy. The Massachusetts Supreme Court found that the plaintiff took valid title to the policy despite the fact that the assignment was not written upon, referenced, noted on, or attached to the policy either in the manner required by the policy or otherwise. *See id.* Thereafter, that same policy was assigned to the *Herman* defendant to secure a debt. *Id.* at 187, 105 N.E. 450. As in this case, that defendant, as the junior assignee, took the assignment with no knowledge of the previous assignment to the plaintiff. *See id.* However, it is not clear what precautionary measures, if any, that defendant took to verify that there had been no previous assignments. *Id.* Here, we know that such precautions were taken by AmSouth. Nevertheless, in concluding that the defendant was entitled to the proceeds of the policy, the *Herman* Court stated:

> [T]his estoppel of a rightful owner to set up his title against a bona fide

purchaser for value from one who had not the right to sell rests upon the conduct of the rightful owner [i.e. the first assignee]. It arises against him *when by his own conduct he has so clothed the wrongdoer with the indicia of ownership as to justify third persons in regarding the wrongdoer as either the rightful owner or as having authority from that owner.* The estoppel arises only from the owner's voluntary action tending to produce and in fact producing that result.

*Herman v. Connecticut Mut. Life Ins. Co.,* 218 Mass. 181, 186, 105 N.E. 450 (emphasis added); *see also Salem Trust Co. v. Manufacturers' Finance Co.,* 264 U.S. 182, 198, 44 S.Ct. 266, 68 L.Ed. 628.

■ Furthermore, the first purchaser of a chose in action

who neglects to give notice to the debtor ... and does not take possession of the evidences of the debt, acquires but an imperfect title as respects to third persons, and by his laches is, in a sense, a contributory party to the fraud perpetrated by his vendor in the subsequent sale to another purchaser of the same debt of fund; and where the latter has used all due diligence by inquiry and notice, the equity of the latter is to be preferred over that of the former.

*In re Gillespie,* 15 F. 734, 735 (S.D.N.Y. 1883) (*citing Loveridge v. Cooper,* 3 Russ. 58. ("Where personal property is assigned, delivery is necessary to complete the transaction, not as between the vendor and the vendee but as to third persons, in order that they may not be deceived by a apparent possession and ownership remaining in a person who, in fact, is not the owner. This doctrine is not confined to chattels in possession, but extends to choses in action, bonds, etc.")).

Accordingly, the Rose plaintiffs had a duty to protect their assignment so as not to be estopped because of laches and/or neglect from claiming priority to the life insurance proceeds. Moreover, the laches and/or neglect of the plaintiffs was a proximate contributing cause to AmSouth's deception by Montana.

There are other precedents confirming this rule. For example, in *State Bank of Mayville v. Jennings, et al.,* 78 Misc. 524, 138 N.Y.S. 606 (1912), the first assignee of a lease, who did not maintain possession of the lease but rather allowed the assignor to retain possession, was not entitled to the priority of title as against a second, good faith assignee. Contrary to the contention of the first assignee that he had superior title because, "the purchaser of a chose in action, or the assignee of a mere equity, must stand upon the title of the assignor, and must fail if his assignor had made a prior assignment of the same equity," the court awarded the lease to the second assignee. *See State Bank of Mayville,* 78 Misc. at 527, 138 N.Y.S. 606. The *State Bank of Mayville* Court reasoned that "[t]he fact that the [first assignee] did not take possession of the leasehold, but permitted [the assignor] to retain the same, thus endowing [the assignor] with the apparent ownership, and enabling [the assignor] to assign and deliver it to the [second assignee], and permitting the [second assignee] to retain such possession for 16 years, *impresses [the first assignee's] act with such laches and neglect that it would be unfair and unjust to award [the first assignee] a superior title to that of the [second assignee], even though [the first assignee's] assignment is prior in point of time." Id.* at 528, 138 N.Y.S. 606 (emphasis added).

In *State Factors Corp. v. Sales Factors Corp.,* 257 A.D. 101, 103, 12 N.Y.S.2d 12 (1st Dep't 1939), the First Department

similarly asked, "which of [the] two innocent parties shall suffer the loss occasioned by the fraud of [the assignor]." Similar to this case, in *State Factors,* the assignor assigned the same accounts receivable to both parties in the action and neither assignee was aware of the transactions between the assignor and the other. *Id.* at 103, 12 N.Y.S.2d 12. That court distinguished equitable title from legal title and determined that these assignments created equitable rights. However, because the second assignee "acquired legal title to the accounts without knowledge of infirmity and upon payment of new consideration, it occupied the position of a purchaser for value without notice, whose legal title is superior both to the [prior assignee's] earlier equitable rights under the contract ... and to subsequent assignments." *Id.* at 103, 12 N.Y.S.2d 12 (internal citation omitted) (*citing Fortunato v. Patten,* 147 N.Y. 277, 41 N.E. 572 (1895)).

Here, the plaintiffs not only failed to take *any* measures to protect their assignment, either by recording or by otherwise providing notice to Fidelity and/or third parties, but they also delayed eleven years, until after Montana's death, to do anything to protect their assignment. On the other hand, AmSouth's acquisition of the 645 policy insurance proceeds was perfectly lawful. AmSouth was an innocent bona fide assignee as it inquired of Fidelity and was told there was no prior assignment. AmSouth followed the policy provision in recording its assignment, and it rightfully recovered the proceeds under its assignment. In fact, AmSouth and Fidelity did not even know of the plaintiffs' existence until after Montana's death. If there is any fault in the payment to AmSouth to the exclusion of the plaintiffs, it does not lie with AmSouth.

## B. The Plaintiff's Causes of Action

As stated above, the plaintiffs allege that the defendant is liable on the basis of (1)

conversion, (2) unjust enrichment, (3) monies had and received, (4) constructive trust.

### 1. Conversion

 The essence of the tort of conversion is not the acquisition of the property but rather the wrongful deprivation of another's property. Conversion is defined as "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of [the] superior possessory right of another in the property." *Galtieri v. Kramer,* 232 A.D.2d 369, 648 N.Y.S.2d 144 (2d Dep't 1996); *see also Peters Griffin Woodward Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 452 N.Y.S.2d 599 (1st Dep't 1982). To establish a claim of conversion under New York law, the plaintiff must show: (1) that he had a legal ownership interest or an immediate superior right of possession to the property and (2) that the defendant exercised unauthorized interference with the plaintiff's ownership or possession of that property. *Kahn v. Crames,* 92 A.D.2d 634, 635, 459 N.Y.S.2d 941, 943 (3d Dep't 1983); *see also Republic of Liberia v. Bickford,* 787 F.Supp. 397, 402 (S.D.N.Y.1992).

As stated above, although the plaintiffs initially held a valid title to the assignment, due to their laches and neglect, they are estopped from now asserting **that** title. Because the Court finds that the plaintiffs lost their right to claim title to the proceeds, AmSouth did not exercise unauthorized dominion or control over the insurance proceeds. *Schwartz v. Capital Liquidators,* 984 F.2d 53, 54–55 (2d Cir. 1993) (*quoting Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dep't 1981)).

Therefore, the plaintiffs' cause of action sounding in conversion is dismissed. The Court will now address the other claims

raised by the plaintiffs, namely unjust enrichment, monies had and received, and constructive trust.

### 2. Unjust Enrichment

In a claim for unjust enrichment in New York, the plaintiff must show: (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.2000) (*citing Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another,'" *Id.* (*quoting City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999)), which, "under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 360 (2d Cir.1999) (*citing McGrath v. Hilding*, 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977)); *see also Golden Pacific Bancorp. v. Federal Deposit Insurance Corp.*, 273 F.3d 509, 519 (2d Cir.2001).

Here, the Court finds that equity weighs heavily in favor of the defendant. Not only did the plaintiffs fail to initially record their assignment, but they also failed to record during the subsequent eleven years. Furthermore, the plaintiffs were unable to point to a single affirmative action they took to protect their assignment. On the other hand, AmSouth expressly inquired of Fidelity as to the presence of any prior assignments and received a written confirmation from Fidelity that there were none. Therefore, AmSouth is an innocent party that lent money based on what it believed to be lien-free collateral and equity demands that it be permitted to retain the insurance proceeds.

The case raised by the plaintiffs in their Post–Trial Memorandum is inapplicable.

In *Morgan v. Ellenville Savings Bank*, 55 A.D.2d 178, 389 N.Y.S.2d 660 (3d Dept. 1976), during a pending foreclosure action, the building was destroyed by fire. At the foreclosure sale, the mortgagee was the sole bidder and purchased the property for the exact amount of the mortgage debt. The Court held that the mortgagor was entitled to the fire insurance proceeds. "Defendant's interest in the fire policy was a form of security and it perished with the mortgage debt." The defendant bank, having purchased the damaged property for the full amount of the mortgage debt, had been made whole and would be unjustly enriched if allowed to retain the insurance proceeds. The *Morgan* factual situation is dissimilar to the facts in this case.

As stated above, AmSouth, without any knowledge of the plaintiffs' prior assignment, had an absolute right to pursue its lawful assignment and retain the proceeds. The plaintiffs had done nothing to protect their assignment for eleven years. Thus, there was no unjust enrichment and the plaintiff's cause of action based on that doctrine is dismissed.

### 3. Monies Had and Received

A cause of action for "monies had and received" is an equitable claim similar in theory to unjust enrichment. It has been described as "an obligation which the law creates in the absence of an agreement when one party possesses money that in equity and good conscience should not be retained and which belongs to another." *Bd. of Educ. of Cold Spring Harbor v. Rettaliata*, 164 A.D.2d 900, 901, 559 N.Y.S.2d 758 (2d Dep't 1990), *remanded on other grounds*, 181 A.D.2d 648, 581 N.Y.S.2d 1007 (2d Dep't 1992); *Interior by Mussa, Ltd. v. Town of Huntington*, 174 Misc.2d 308, 311, 664 N.Y.S.2d 970 972 (1997).

■ A claim for monies had and received in New York is considered either a "quasi-contract or [a] contract implied-in-law." *Bd. of Educ. of Cold Spring Harbor Cent. Sch. Dist.*, 559 N.Y.S.2d at 759 (1990) (*citing State v. Barclays Bank of New York, N.A.*, 76 N.Y.2d 533, 540, 561 N.Y.S.2d 697, 563 N.E.2d 11 (1990)). Such a claim is recognized as follows:

> [I]n the absence of an agreement when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another. It allows [a] plaintiff to recover money which has come into the hands of the defendant impressed with a species of trust because under the circumstances it is against good conscience for the defendant to keep the money.

*Id.* (internal quotations and citations omitted). Although the claim rests upon equitable principles because it concerns the broad considerations of right, justice and morality, it is "considered an action at law." *Id.* (internal quotations and citations omitted).

A classic situation supporting this cause is set forth in *Rocks & Jeans, Inc. v. Lakeview Auto Sales & Service, Inc.*, 184 A.D.2d 502, 584 N.Y.S.2d 169 (2d Dep't 1992) in which the plaintiff gave a $25,000 deposit to the defendant for the purchase of an automobile, when the defendant received the money as part of a fraudulent scheme. Another common situation is where money is mistakenly paid, so long as the recipient has not detrimentally relied on the payment. *Banque Worms v. BankAmerica International*, 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991).

In their Post–Trial Memorandum, the plaintiffs rely on *Superior Brassiere Co. v. Zimetbaum*, 214 A.D. 525, 212 N.Y.S. 473 (1st Dep't 1925). As discussed previously, this case placed great reliance on the Supreme Court's decision in *Salem Trust Co.*

*v. Manufacturers' Finance Co.*, 264 U.S. 182, 44 S.Ct. 266, 68 L.Ed. 628, which expressly stated that "[i]t would be unconscionable to permit [the first assignee] to prevail over a later assignee whom he had misled or deceived in respect of the assignor's title at the time of purchase by the latter." *Salem Trust Co.*, 264 U.S. at 198, 44 S.Ct. 266.

For the reasons stated above, in equity and good conscience the money belongs to the defendant and it can legally retain such funds. As a result of the plaintiffs' neglect and laches, the defendant is currently in possession of the same insurance proceeds to which the plaintiff asserts title. The plaintiffs failed to establish that, under the principles of equity and good conscience, the defendant is liable for monies had and received. Accordingly, the cause of action for monies had and received is dismissed.

### 4. Constructive Trust

■ A claim for constructive trust in New York is an equitable remedy. *See Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 360 (2d Cir.1999). "Its purpose is to prevent unjust enrichment, although unjust enrichment does not necessarily implicate the performance of a wrongful act." *Id.* at 361 (*citing Simonds v. Simonds*, 45 N.Y.2d 233, 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978)). "What is necessary is that the court identify a party who is holding property 'under such circumstances that in equity and good conscience he ought not to retain it.'" *Id.* (*citing Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337 (1916)). The central consideration for a court considering this cause of action is equity. *Id.* (*citing Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 389, 122 N.E. 378 (1919)) ("A court of equity in decreeing a constructive trust is bound by no unyielding formula. The eq-

uity of the transaction must shape the measure of relief.").

Under New York law, the elements of a constructive trust are: (1) a confidential or fiduciary relation; (2) a promise; (3) a transfer in reliance thereon; and (4) unjust enrichment. *Sharp, supra,* 40 N.Y.2d at 121, 386 N.Y.S.2d 72, 351 N.E.2d 721. Although these elements provide important guideposts, the constructive trust doctrine is equitable and should be reviewed flexibly. *In* re *Koreag v. Refco,* 961 F.2d 341, 352 (2d Cir.1992); *Coco v. Coco,* 107 A.D.2d 21, 24, 485 N.Y.S.2d 286, 289 (2d Dep't 1985).

In this case, there is no confidential or fiduciary relation; no promise of any kind by AmSouth; and no transfer in reliance of any promise. In addition, as the Court has already stated, there is no unjust enrichment. Thus, there is no reason that AmSouth, in good conscience and equity, should not retain the proceeds of the policy. Accordingly, the plaintiffs have failed to make out a cause of action grounded on a constructive trust and that cause of action is dismissed.

## IV. CONCLUSION

As noted above, under the facts in this case, the plaintiffs failed to establish a viable cause of action in conversion, unjust enrichment, monies had and received or constructive trust. Accordingly, judgment is granted in favor of the defendant AmSouth dismissing the complaint, as amended after trial, in its entirety.

The Clerk is directed to enter judgment in favor of the defendant AmSouth dismissing the complaint.

The Clerk is directed to close this case.

**SO ORDERED.**